# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

PHYLLIS J. MAY,               *
                             *
    Plaintiff,             *
                             *
vs.                          *          CV 513-45
                             *
CITY OF NAHUNTA, GEORGIA;     *
DARREN CREWS, former Chief of Police  *
of the City of Nahunta Police Department,  *
in his individual capacity; and TOMMY L.  *
ALLEN, in his individual capacity,  *

    Defendants.

## ORDER

On August 3, 2011, Ronnie Jacobs called 911 because he could not awaken his sister, Plaintiff Phyllis May. A police officer who arrived on the scene interacted with May and then brought her to the hospital. This case involves what transpired that day. Plaintiff brought this suit against Tommy L. Allen ("Allen"), the police officer who brought her to the hospital, Darren Crews ("Crews"), then-Chief of Nahunta's Police Department, and the City of Nahunta, Georgia ("the City"). Plaintiff's first two claims are for civil rights violations under 28 U.S.C. § 1983: (1) seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution and (2) false imprisonment in violation of the due process clause of

AO 72A
(Rev. 8/82)

the Fourteenth Amendment.  Plaintiff also brings state law

causes of action for assault and battery, invasion of privacy,

and false imprisonment.  Presently before the Court is

Defendants' Motion for Summary Judgment.  Dkt. No. 34.  Upon due

consideration, Defendants' motion is **GRANTED**.

## I.    FACTS

### a. Plaintiff May's Health Issues

In August of 2011, Plaintiff May, a 51-year-old woman,

lived with and was the sole caregiver for her elderly mother,[1]

who suffered from Alzheimer's disease and Sundowner's syndrome.[2]

Dkt. No. 34-6 ("May Dep."), 5:14-16, 8:3-7, 52:19-20.  May

herself suffers from Pick's Disease, which is cerebral atrophy

or shrinking of the brain.  May Dep. 14:9-10.  Her Pick's

Disease causes headaches and seizures.  Id. at 14:23-25.  At the

time of the events at issue, May was taking numerous

medications, some of which were for her Pick's Disease symptoms

and some of which were for other medical issues.  Dkt. No. 41-3,

p. 3.  According to May, she was taking phenobarbital for

seizures, Seroquel to help her sleep, Clonopin for anxiety,

Celexa for depression, and Lorcet for headaches and back pain.

---

[1] May's mother was 91-years-old at the time of May's deposition on March 14, 2014, so she would have been a few years younger at the time of the relevant incidents.  May Dep. 49:6-7.

[2] The Court focuses on Plaintiff's version of the facts for the purposes of this motion but will note relevant differences between Plaintiff's and Defendants' accounts.  To be clear, the Court has gone to great lengths to analyze the facts in the light most favorable to the Plaintiff.

AO 72A
(Rev. 8/82)

May Dep. 29:16-25, 30:1; 31:1-19; 33:8-12; 36:1-7; 36:8-18. May also took medications for blood pressure, stroke prevention, and cholesterol. May Dep. 35:15-19; 35:1-8; 34:10-12. Most of the medications were prescribed by May's primary care physician, but the Seroquel was prescribed by Satilla Mental Health, where May was a weekly patient from roughly 2005 until August of 2011.

**b. Arrival of Emergency Medical Services**

Because of her illness, May's mother had difficulty sleeping. As her mother's primary caretaker, May was awake for five or six days leading up to August 3, 2011. May was exhausted. May Dep. 5: 23-24. In addition to the aforementioned ailments, May was experiencing caregiver breakdown, which she described as a state brought on by taking care of everyone else and not herself. May Dep. 14:15-22. May called her brother, Ronnie Jacobs, and asked him to come watch their mother. At the time, Jacobs was Mayor of the City of Nahunta. May told Jacobs, "my body is going down, I can't take it no longer." May Dep. 10:10-15. Before Jacobs arrived, May fell asleep in her nightgown. Id. at 10:10-19; Dkt. No. 41-3, ¶ 7.

Jacobs, at the time, was in a trailer next door to the house where May and her mother were living. Jacobs testified that his mother came to get him because she was concerned about May, who had been lying down for a few hours. Dkt. No. 34-7

("Jacobs Dep."), 32:12-18.  When Jacobs arrived at the house,
May was lying on a bed with her eyes shut.  May was not
initially responsive, so Jacobs called 911 to ask for emergency
medical services ("EMS") assistance.  Dkt. No. 41-3, ¶¶ 9, 10.
Jacobs knew that May had been nauseated and thought May's Pick's
Disease might be affecting her health.  Jacobs Dep. 30:12-17;
Dkt. No. 41-3, ¶ 10.  At some point, May's sister, Wanda Smith,
arrived.  While Jacobs was calling 911, Smith entered May's room
and called out her name, but May did not answer.  It appeared to
Smith that May was in a deep sleep.  Dkt. No. 41-1 ("Smith
Aff."), ¶¶ 5-6.  May's mother feared that she was dead.  May
Dep. 11:10-13.

Four to five emergency medical technicians ("EMTs") arrived
in two ambulances.  Dkt. No. 41-3, ¶ 12.  Upon their arrival,
May, who "had been reported unconscious," was unresponsive.
Dkt. No. 41-2 ("Farrior Aff."), ¶ 5.[3]  The EMTs woke May by
placing an ammonia capsule under her nose.  Dkt. No. 41-3, ¶¶
13-15.  May awoke suddenly and swung her arm because she thought
a bee had stung her nose; she did not hit anyone.  May Dep.
13:10-25.  After May regained consciousness, she told the EMTs
about her Pick's Disease and caregiver breakdown condition.  May
Dep. 14:3-22; Dkt. No. 41-3, ¶ 16.  She also told the EMTs about

---

[3] Plaintiff supplied an affidavit from David Farrior, one of the Brantley
County EMS medics who responded to the call for assistance.  Dkt. No. 41-2.

her prescribed medications. Farrior Aff. ¶ 6. May informed the EMTs that she took medicine to help her sleep because she had been awake for so long. Smith Aff. ¶ 10. According to Farrior, one of the EMTs on the scene, the EMS team "determined that Ms. May was not attempting to harm herself and that she was not a threat to anyone else." Farrior Aff. ¶ 7. Farrior also reported that, during their observation of May, "she was not acting irrationally or uncontrollably and did not do anything that caused us concern that she might harm herself or anyone else."[4] Id. When asked if she wanted to go to the hospital, May responded no because she knew what was wrong with her: she was just very tired. May Dep. 15:9-12. The EMTs determined that May was capable of signing to refuse their continued services, and May signed a form to refuse a hospital transport. Farrior Aff. ¶¶ 8-9. Farrior stated that after May signed the refusal form, EMS left the scene. Id. ¶ 10.

### c. Arrival of Officer Tommy Allen

At some point during the August 3rd incident, Tommy Allen, a police officer on patrol, received a call from the Brantley County 911 radio operator. Allen was informed that Brantley County EMS was at a house and requesting police assistance.

---

[4] In addition to Farrior's testimony that Plaintiff was not a danger to herself or others, Plaintiff points to the testimony of Jacobs that May was not suicidal or combative with the EMTs. Dkt. No. 41-3, ¶ 16. Smith also stated that May was not doing anything that caused her to be concerned that she was a threat to herself or anyone else. Smith Aff. ¶ 12.

AO 72A
(Rev. 8/82)

Dkt. No. 39 ("Allen Dep."), 18:10-25. When Allen arrived, the EMTs were still at the house. Dkt. No. 41-3, ¶¶ 17-18. Allen recounted that he was met outside by the EMTs, and he asked why they had called him. Allen Dep. 21:3-10. One of the male EMTs told him, "Well, we got a lady in here that has been a little combative to herself. She is upset." Id. at 21:11-25. Allen responded, "Okay. Let's go in there and talk to her[,]" and entered the house. Id. Allen described that he and the four EMTs entered a small, neat room, where May was sitting on the side of the bed. Id. at 24:25-25:1-3. One of the male EMTs said "this is her" to Allen; an EMT also told Allen "that [May] had already clasped up her fists and was doing each side of her head vigorously and scruffing and hitting herself in the head."[5] Id. at 25:3-8.

May recounted that Allen made everyone leave the room before shutting the door and locking it by sliding a latch over. May Dep. 17:7-18. Allen states that he asked everyone to leave because they were talking amongst themselves, and he wanted May's undivided attention. Allen Dep. 25:9-13. Allen alleges that he asked a young male EMT to stay while he asked May a few questions about the medications she was taking. After May denied taking any medications that were not prescribed and

---

[5] Plaintiff contends that any statement by an EMT to Allen is hearsay and should not be admitted as evidence on a motion for summary judgment. Dkt. No. 41-3, ¶¶ 18-19. The Court will address this argument infra.

AO 72A
(Rev. 8/82)

denied taking too much of any of her prescribed medications, the last EMT left the room with everyone else. Id. at 25:13-26:10.

Allen told May she was going to the hospital.[6] May Dep. 17:9-12. May asked why, and Allen responded, "Because you are." Id. at 18:7-12. Allen directed May to take her nightgown off, and May started crying. May contends that Allen reached up and "started touching [her] and taking [her] nightgown off." Id. at 18:14-15. When Allen touched May, he touched her shoulder as he was helping her take the nightgown off. Id. at 18:11-19:7. May stated that Allen was "rough", and when asked to explain how, she described that he was "just very hateful acting of [sic] hurry up and take the gown off." Id. at 19:10-17. May's clothes were at the foot of the bed, and Allen handed her the clothes, one at a time, starting with her shorts. Id. at 18:16-19. After May put her shorts on, Allen told her to take them off and put her underwear on. When May refused, Allen said "Yes, you will", and he patted his gun. May did as she was told. Id. at 20:12-16.

During this time, May could hear her sister and others knocking on the door and saying, "Unlock the door. Unlock the door." Id. at 20:17-21. While Jacobs recounted that he was "hollering for him to open the door" and "asking him what are

_____

[6] Allen describes a more extended conversation with May about her problems and what she wanted to do.

AO 72A
(Rev. 8/82)

you doing in there locked up with my sister by yourself", Jacobs
Dep. 43:5-22, Smith's account is less colorful: "When I couldn't
open the door, I called out Phyllis' name but I didn't hear any
response from inside the room. The door has a lock on the
inside that you have to slide from one side to the other. While
the police officer was inside the bedroom with Phyllis behind
the locked door, I sat on the couch in the living room with our
brother and mother." Smith Aff. ¶¶ 17-18.

Allen proceeded to give May her top, and she put it on.
Allen told her to straighten up and dry her tears. Allen
unlocked the door, and the two left the room. May Dep. 22:1-6.
Jacobs estimated that they were in the room with the door locked
for "15 minutes, if not 20." Jacobs Dep. 44:11-14. May was
sexually assaulted by her father over a period of several years
during her childhood. She described that Allen "opened up a
wound" by "[a]sking her to take [her] clothes off . . . the way
[her] daddy used to do []." May Dep. 52:3-11. May attests that
these events were "very traumatizing", and though she had been
attending mental health counseling before as well, her issues
worsened after this day. Id. at 69:22-25, 70:14-25, 71:1-10.

Allen's whole account of what happened in the room is quite
different. He described that May started telling him about her
caregiver breakdown, and he asked if she wanted some help.
Allen Dep. 26:20-24. Allen said that May told him she would not

AO 72A
(Rev. 8/82)

ride in the ambulance, and he asked her if she would be okay with riding in the back of the patrol car and him "carrying [her] to the hospital." Id. at 27:1-4. When May answered, "You won't let them put me in mental health?", Allen described that "that little light [went] off", and he asked her whether she was a mental health patient. Id. at 27:5-8. May answered "Yes." Id. at 27:9. Allen proposed going with May, "carry[ing] her" in his patrol car to Satilla Regional, and having someone "with Crisis" come to talk to her. Id. at 27:23-25. According to Allen, May agreed, and so he told her to "put some clothes on."[7] Id. at 28:1-14.

Allen described that he was leaning back against a chest of drawers. May picked up her shorts and started putting them on before her underwear. Allen asked if she wanted to put "under clothes" on, and May said that she did not need them. Allen

---

[7] May denied most all of this. She said that Allen never asked her if she wanted mental health help. She denied having told him that she was a mental health patient. And she denied telling him she would go to the hospital as long as it was not in an ambulance; May would have preferred going in an ambulance to a "cop car." May Dep. 27:1-16. Plaintiff's briefing attempts to depict May's responses to direct deposition questions as responses that she gave to Allen, but the evidence does not support that representation. For example, in her deposition, May was asked, "At some point did you tell him you had been a mental health patient?" And May responded, "No." Id. at 27:4-8. Plaintiff cites this and says, "Allen asked if May was a mental patient. May denied she had been a mental health patient." Dkt. No. 41-3, ¶ 22. May's denials at her deposition did not describe what she actually said to Allen in the room—in fact she altogether denies that she was asked many of the questions that Allen says he asked. The Court will accept Plaintiff's version of the facts where it conflicts with Allen's version—but only insofar as Plaintiff's version of the events is supported by the record evidence.

AO 72A
(Rev. 8/82)

responded, "That is your business.  Go ahead."[8]  Id. at 28:16-29:3.

### d. Trip to the Hospital

After the two emerged from the room, Allen said he had a brief exchange with Jacobs.  Allen told Jacobs he was taking May to Satilla Regional Hospital to speak with someone "with Crisis."  Allen Dep. 24:3-17.  Jacobs said there was nothing wrong with May—she had "come across a little money" and had "some kids that [were] trying to suck her dry of it."  Id. Allen said he did not know about any of that, but told Jacobs, "Anyhow, I think she will be fine.  We will get her over [to Satilla Regional] and get somebody to talk to her."  Id.  Jacobs denied that this exchange occurred.  Jacobs Dep. 46:22-24. Jacobs stated that Allen may have told Smith that he was carrying May to Waycross.  Id. at 48:3-24.

May stated that the EMTs stopped her and apologized to her "for what just happened" to her, and May understood that to mean they were sorry about what happened in the bedroom with Allen. May Dep. 23:5-16.  Jacobs described that Allen marched May out the front door; Allen "had her by the arm" and was "carrying" her to the police car.  Jacobs Dep. 45:16-46:4.  Next, Allen "put [May] in the back of the police car" and brought her to the

---

[8] Though the Court has set forth Allen's version of what happened for the sake of completeness, to the extent the two accounts differ, the Court considers May's version of the events for the purposes of the summary judgment motion.

AO 72A
(Rev. 8/82)

hospital in Waycross, Georgia. May Dep. 24:6-14. On the way to the hospital, Allen asked May what she thought about her brother. May answered, "I ain't talking about Ronnie[,]" and that was the end of the conversation. Id. at 71:14-22.

Once they arrived at the hospital, May testified that Allen "got [her] out" of the car and then "grabbed [her] by the arm, [and] put [her] upside the car like [she] was a criminal." May Dep. 74:9-16. Allen took May into the emergency room. Id. at 24:15-24. After they were inside, Allen told May to "stand against the wall" and to "straighten up." Id. Allen told the hospital employees that May needed a room and asked them about her previous medical diagnoses. An employee told Allen that May suffered from Pick's disease and caregiver breakdown. Allen made a sign by putting his thumb and first finger together (an "okay" symbol, presumably) and then proceeded to leave the hospital. Id. at 25:10-26:2. Allen did not lock May in a room at the hospital. Id. at 75:16-19. May was treated at the hospital and eventually dismissed. Id. at 26:3-24. After no more than two hours, Jacobs took May home. Jacobs Dep. 52:11-14.

May confirmed that no handcuffs were ever used, and Allen did not threaten to hurt her in any way. May Dep. 75:20-76:2.

### e. Chief of Police Darren Crews

Defendant Darren Crews, who was Chief of Police at the

time, was out of town during these events. Dkt. No. 38 ("Crews Dep."), 22:14-17. Jacobs believes that he spoke to Crews about the events of August 3, 2011 "the next morning" at Nahunta City Hall. Jacobs Dep. 57:8-15. Jacobs maintains that he told Crews that Allen should not have made Plaintiff take her clothes off while he was alone in a room with her; there should have been a female EMT present. Id. at 57:17-22. Jacobs told Crews that Allen locked the door while in the room with Plaintiff. Id. at 57:23-25. According to Jacobs, after he told Defendant Crews everything that happened, Defendant Crews did not seem concerned and said, "Well, we'll see." Id. at 58:1-15.

A few days after Crews returned to town, Allen went to his home to tell him about what happened. Crews Dep. 24:15-22. Crews did not ever reprimand, discipline, or cite Allen for any violations of law or policy, and no one in the Nahunta Police Department conducted an investigation into the events of August 3, 2011. Id. at 18:20-24, 29:8-11. Crews testified that Jacobs never contacted or spoke with him about the events at issue. Id. at 28:16-25, 29:1-11. During Crews' time as Chief of Police, this was the only incident of its type; there were no other situations Crews recalled in which an officer was called to transport an individual with mental health issues to the hospital. Id. at 38:10-21.

**f. Training and Policies**

AO 72A
(Rev. 8/82)

Crews was the Chief of Police for Nahunta from January of 2008 through February of 2012. Crews Dep. 7:13-16. He had both administrative and patrol duties, and he was the final decision-maker for the Police Department. Id. at 8:2-3, 10:1-11. Police officers were required to participate in 20 hours of training per year which was conducted by the Police Officer Training Council ("POST"). Id. at 8:13-24.

The Mayor and City Council of Nahunta were responsible for the adoption of Police Department policies and procedures. Crews Dep. 12:9-12. In response to production requests for policies and procedures pertinent to the events at issue and in place for the years 2010 and 2011, Defendants' counsel responded, "To the extent that any such procedures or policies exist, they would be included in the Policy and Procedure Manual of the Nahunta Police Department" and supplied a copy of that manual. Dkt. No. 41-6, pp. 2-4. When asked about the manual supplied, Crews was not aware of and had not reviewed it; however, he seemed to recall a different policy document. Crews Dep. 10:12-11:4. Though Crews attempted to develop a new policy for the Police Department, it was never passed by the Mayor and City Council. Id. at 11:13-12:19. Crews expressed that the officers followed city codes, state law, and his own knowledge. Id. at 12:20-25. Crews suggested that he had never seen a written policy regarding what a law enforcement officer should

AO 72A
(Rev. 8/82)

do if he or she believed or suspected a citizen needed medical attention.  Id. at 13:21-25, 14:1-14.

Plaintiff asserts that Allen did not receive "any specific training on the legal standards for detaining and seizing an individual with mental health problems." Dkt. No. 41-3, ¶ 65. In support of this conclusion, Plaintiff pointed to a 13-page exhibit including a long list of training courses in which Allen participated.  Dkt. No. 39-1.  Plaintiff also cited Defendants' response to Plaintiff's request for the production of materials from training sessions that Allen attended, but Defendants did not actually provide these documents, rather they explained that they would only do so subject to a confidentiality agreement. Dkt. No. 41-6, ¶¶ 7, 9.  In response to questioning about his training regarding how to deal with individuals with mental health problems, Allen stated that he participated in crisis intervention training ("CIT").  Allen Dep. 53:4-14.  That training involved role-playing, where Allen, as the officer, interacted with another person who, in the role-play, had a mental health problem.  Allen recalled that the officer "would talk to them and try to calm them down, if need be get them to somebody that they can see, somebody at the hospital that can come in with crisis and talk to them."  Id. at 53:15-54:1.  He described that the CIT training lasted a week and was "basically dealing with mental health patients."  Id. at 54:2-24.

AO 72A
(Rev. 8/82)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). A mere scintilla of evidence in support of the nonmovant's position is insufficient to defeat summary judgment; rather, "there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

## III. DISCUSSION

### a. Preliminary Issues

Plaintiff contends that the statements of the EMTs to Defendant Allen are hearsay and should not be considered on a

AO 72A
(Rev. 8/82)

motion for summary judgment. Dkt. No. 41-3, pp. 4-5. However, as Defendants point out, the statements were not offered to prove the truth of the matter asserted, or that May had actually been combative to herself; rather, the statements were offered to show why Allen believed what he did about May's state of mind. Because the statements were offered "only to show what was said, not that it was true", the statements are admissible. Dkt. No. 42, p. 4 (quoting United States v. Ransfer, 749 F.3d 914, 925 (11th Cir. 2014)).

Plaintiff also takes issue with certain statements in Defendant Allen's affidavit. Defendant Allen stated that, based on his interactions with Plaintiff and information he was told by an EMT, he believed Plaintiff "was potentially suicidal or posed a danger to herself." Dkt. No. 34-3 ("Allen Aff."), ¶¶ 3, 6. First, Plaintiff contends that the affidavit fails to meet the requirements of Federal Rule of Civil Procedure 56(c)(4), because it was not made on personal knowledge and failed to show Allen was competent to testify on the matters stated. Dkt. No. 41, p. 16. Next, Plaintiff maintains that the affidavit contradicts Allen's sworn deposition testimony, and the Court may disregard the affidavit in its summary judgment determination. Id. at pp. 14-15.

Federal Rule of Civil Procedure 56(c)(4) states that an affidavit "must be made on personal knowledge, set out facts

AO 72A
(Rev. 8/82)

that would be admissible in evidence, and show that the affiant

or declarant is competent to testify on the matters stated."

Allen's affidavit statements were based on what he heard and

what he observed.  The Court finds that his statements were made

based on his personal knowledge, and while his beliefs may have

been erroneous, he is competent to testify about what those

beliefs were.

In his deposition, Defendant Allen was asked,

> Q.  Officer Allen, I am just trying to get it
> straight.  No. 1, she wasn't physically dangerous
> to herself or others at the time, right, at that
> time?
>
> A.  None other than what the EMS told me, that
> she had done clasped her fists up and was
> scruffing the side of her head and hitting
> herself in the side of her head.  Did I see that?
> I did not.  When I entered the room was her hair
> all over her head in disarray?  Yeah.
>
> Q.  Other than you say her hair was in disarray,
> she wasn't physically harming herself or others,
> right?
>
> A.  No.

Allen Dep. 49:2-19.  Plaintiff contends that this deposition

testimony contradicts Defendant Allen's affidavit, because in

the affidavit, he stated that his opinion that Plaintiff was

potentially suicidal was based on his interactions with

Plaintiff *and* information he was told by the EMT, whereas his

deposition testimony suggested it was solely based on what the

EMT told him.  Plaintiff invites the Court to disregard

17

Defendant Allen's testimony because of this alleged contradiction. See Dkt. No. 41, p. 17. The deposition testimony does not directly contradict the affidavit statements, however. The fact that Defendant Allen did not personally observe Plaintiff physically acting dangerously towards herself does not preclude the possibility that he believed, as he professes, that she posed a danger to herself. Defendant Allen's statement that Plaintiff's hair was "all over her head in disarray" demonstrates one way in which his assessment regarding Plaintiff was based on his own interactions with May. Allen Dep. 49:13-15. Defendant Allen's deposition testimony does not contradict his affidavit, and the Court will not disregard it in considering the motion for summary judgment.[9]

---

[9] Similarly, Plaintiff attempts to show that Defendant Allen did not think Plaintiff was a danger to herself or others by citing a different portion of his deposition testimony. Dkt. No. 41, p. 26. Defendant Allen said that Plaintiff agreed to go to the hospital voluntarily, and was then asked,

> Q. If she did not, meaning she did not want to go, did you have authority to take her to the hospital?
>
> A. If I felt she would have been a threat to herself or others, yeah. I can place her under protective custody and carry her over there. **That did not take place though.**

Allen Dep. 48:3-10 (emphasis added). Plaintiff suggests that this meant that Defendant Allen thought Plaintiff was not a threat to herself, but in light of a statement a few lines down, "That did not take place though" was in reference to the first half of the question, which suggested Plaintiff did not want to go to the hospital. A moment later, Defendant Allen said,

> If someone is dealt with with [sic] law enforcement and they pose a threat to theirself [sic] or others, I am going to carry them somewhere to have them evaluated, okay? That's just what I did. However, backing up, she voluntarily wanted to go to the hospital to talk to somebody about whatever her problem may have been.

AO 72A
(Rev. 8/82)

### b. Qualified Immunity

Both Defendant Allen and Defendant Crews claim entitlement
to qualified immunity. Dkt. No. 34-1, p. 20. "The doctrine of
qualified immunity protects government officials 'from liability
for civil damages insofar as their conduct does not violate
clearly established statutory or constitutional rights of which
a reasonable person would have known.'" Pearson v. Callahan,
555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S.
800, 818 (1982)). Qualified immunity affords protection to a
government official sued in his individual capacity "unless the
law preexisting the defendant official's supposedly wrongful act
was already established to such a high degree that every
objectively reasonable official standing in the defendant's
place would be on notice that what the defendant official was
doing would be clearly unlawful given the circumstances."
Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting
Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002)).

First, the government official seeking the protection of
qualified immunity must prove that he was acting within the
scope of his discretionary authority when the alleged wrongful
conduct took place. Terrell, 668 F.3d at 1250. Once that is
shown, the burden shifts to the plaintiff to show that qualified

---

Id. at 48:23-49:5. On summary judgment, the Court accepts that Plaintiff did
not want to go to the hospital voluntarily, but this testimony does not show
that Defendant Allen thought Plaintiff was not a threat to herself,
especially in light of the evidence that he did.

AO 72A
(Rev. 8/82)

immunity does not apply.  Id.  To do this, the plaintiff must show that (1) "the facts [plaintiff] has shown make out a violation of a constitutional right" and (2) "the right at issue was clearly established at the time of the defendant's alleged misconduct."  Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013) (citing Pearson, 555 U.S. at 232).  A court may decide, in its discretion, which of the two prongs to analyze first.  Id. at 272-73.

Here, no one disputes that Defendants Allen and Crews were exercising discretionary authority, Dkt. No. 41, p. 25, so the burden shifts to Plaintiff to show that qualified immunity does not apply.

### c. Officer Allen

#### i. Fourth Amendment

Plaintiff contends that Defendant Allen unconstitutionally seized her, in violation of the Fourth Amendment to the United States Constitution, when, without a warrant or probable cause, and against Plaintiff's will, he detained her in the bedroom and then transported her to the hospital for an evaluation.  Dkt. No. 41, p. 14.  Plaintiff does not dispute that Defendant Allen initially had probable cause to enter her house while responding to the 911 call,[10]  but she contends that the probable cause

---

[10] This is based on the "exigent circumstances" or "emergency aid" exception to the warrant requirement.  See United States v. Timmann, 741 F.3d 1170, 1178 (11th Cir. 2013).

AO 72A
(Rev. 8/82)

ended when he locked her bedroom door, which was not objectively reasonable under the circumstances. Id. at pp. 16-17.

Defendants concede that, under Plaintiff's version of the relevant events, a seizure occurred while Plaintiff and Defendant Allen were in the room with the door locked. Dkt. No. 34-1, p. 12 (citing Chandler v. Sec'y of Fla. Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir. 2012)). Defendants contend that the seizure ended when Plaintiff left the bedroom because, though Jacobs testified that Defendant Allen was holding Plaintiff's arm as they walked to the police car, Plaintiff testified that, after leaving the bedroom, Defendant Allen did not touch her again until they were getting out of the car at the hospital. Dkt. No. 42, pp. 6-7 (citing May Dep. 74:3-6). Additionally, according to Defendants, Plaintiff does not explain why a reasonable person in her situation would have thought she was not free to go at that point.

"[A] person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Chandler, 695 F.3d at 1199 (quoting United States v. Mendenhall, 466 U.S. 544, 554 (1980)). Drawing all reasonable inferences in Plaintiff's favor, despite the disparity in the evidence regarding whether or not Defendant Allen was physically holding Plaintiff's arm as they walked from the house to the car,

Plaintiff was still seized during the walk to the car and the drive to the hospital. As Plaintiff describes, Defendant Allen told her she had to go to the hospital, made her change clothes, and patted his gun to make her comply. Under these circumstances, a reasonable person would not have believed that he was free to leave.

For mental health related—as opposed to criminal—seizures, the Fourth Amendment requires that an officer have probable cause to believe the person stopped is dangerous to himself or others. Roberts v. Spielman, 643 F.3d 899, 905 (11th Cir. 2011) (citations omitted). "[A] showing of probable cause in the mental health seizure context requires only a probability or a substantial chance of dangerous behavior, not an actual showing of such behavior." Roberts, 643 F.3d at 905-06 (quoting Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997)).

In Roberts, the Eleventh Circuit considered whether a Fourth Amendment violation occurred in a similar set of circumstances to those in this case. 643 F.3d 899. Officer Spielman, responding to a call about a possible suicide attempt, went to Roberts' home and attempted to speak with her. Id. at 902. Roberts, who Spielman was told had a history of suicide attempts and was medicated for bipolar disorder, eventually came onto her back deck and told Spielman, in a hostile manner, to leave. Id. After a few minutes, Roberts yelled, "Get the f---

AO 72A
(Rev. 8/82)

out of my house or I will—." Id. At that point, Spielman allegedly grabbed Roberts' arm and brought her outside to a different area of her property. Id. at 902-03. He told her he was performing a welfare check, and Roberts responded by continuing to yell at Spielman and a former relative of Roberts' who was also present. After more yelling, Spielman left Roberts' house. Id.

The Eleventh Circuit determined that, in light of what Spielman was told regarding Roberts as well as Roberts' behavior towards him, "Spielman could reasonably have believed that Roberts posed a danger to herself that justified his remaining inside the doorway of her home for about five minutes and then, for safety reasons, briefly removing her from the home while he tried to calm her down and determine her mental state." Id. at 906. The Court found that Spielman's conduct did not violate the Fourth Amendment, and even assuming a constitutional violation, a reasonable officer in Spielman's shoes would not have known that his conduct was unlawful, and thus the conduct did not violate a clearly established constitutional right. Id.

There are a few important differences between what happened in this case and what happened in Roberts. The most significant difference is that Defendant Allen, after locking Plaintiff in a room and making her change clothes, brought Plaintiff to the hospital against her will. In finding as it did, the Eleventh

23

Circuit in Roberts stressed the "limited scope of Deputy Spielman's entry into the home and encounter with Roberts." Largely because of the hospital trip, the encounter in this case was considerably longer and more involved than that in Roberts.

Keeping in mind those differences, the Court must determine whether, in this case, Defendant Allen had probable cause to believe that Plaintiff was dangerous to herself, which requires showing only a probability or substantial chance of dangerous behavior and not an actual showing of such behavior. See Roberts, 643 F.3d at 905-06. The evidence shows that Defendant Allen was told by an EMT that Plaintiff was acting "a little combative" towards herself, was upset, and had used her fists to vigorously scruff and hit herself in the head. Based on Defendant Allen's interactions with Plaintiff as well as the information he received from the EMT, he concluded that Plaintiff had a mental health problem. Allen Aff. ¶ 3. He believed she was potentially suicidal or dangerous to herself. Id. He was afraid that she might cause harm to herself if left alone in the bedroom. Id. at ¶ 6. The fact that Defendant Allen was called to assist EMS, in itself, would reasonably have influenced his assessment. Though May's family members and one of the EMTs allege that May was not acting in a way that was dangerous to herself, and while it is a closer case than Roberts because of the aforementioned differences, Defendant Allen,

based on the information he possessed, could reasonably have believed that there was probability or substantial chance of dangerous behavior by May which justified his monitoring her in the room and bringing her to the hospital. His actions were objectively reasonable under the circumstances.

Even assuming that Defendant Allen did not have probable cause to seize May, a reasonable officer in Allen's shoes would not have known that his conduct was unlawful, and thus, the conduct did not violate a clearly established right. See Anderson v. Creighton, 483 U.S. 635, 640 (1987).

While a case directly on point is not necessary in order to make a determination that the law is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Morris v. Town of Lexington Ala., 748 F.3d 1316, 1322 (11th Cir. 2014) (citing Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011)). A plaintiff can show that the contours of a right were clearly established either by showing that a materially similar case has already been decided, by pointing to a broader, clearly established principle that should control the novel facts of the situation, or by showing that the conduct involved so obviously violated the Constitution that prior case law is unnecessary. Terrell, 668 F.3d at 1255 (internal citations omitted). For a right to be deemed clearly established, the line between unlawful and

AO 72A
(Rev. 8/82)

lawful conduct must be a bright one; "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993). In making this showing, a plaintiff may only consider Supreme Court, Eleventh Circuit, and Georgia Supreme Court cases. Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 955 (11th Cir. 2003) (citations omitted).

Plaintiff argues that Roberts is a materially similar case to this one which clearly established that Defendant Allen's conduct was unconstitutional. The main issue with this argument, as Defendants point out, is that the Roberts court did not find that there was a constitutional violation. Dkt. No. 42, p. 16 (citing Roberts, 643 F.3d at 906). The Eleventh Circuit's finding that the officer in Roberts did comply with the Fourth Amendment in the circumstances of that case cannot be said to give fair warning to other officers about what set of facts and conduct would clearly violate Fourth Amendment rights in the mental health seizure context. Arguably, the Roberts court did stress the limited nature of the officer's encounter with the plaintiff, hinting that a more extended encounter might be found to violate constitutional rights, but it did not, by any means, draw a bright line or give fair notice to officers about what conduct would be clearly unlawful in the mental

health seizure context.

The Roberts court found that the plaintiff in that case "cited no binding precedent that clearly established that probable cause and exigent circumstances immediately evaporate once an officer performing a welfare check for a possibly suicidal person sees that the person is merely alive." 643 F.3d at 906. Similarly, the Plaintiff in this case has cited no binding precedent that clearly establishes that an officer does not have probable cause for a mental health seizure when other people present are not concerned that the person might harm herself.

To find that a broader, clearly established principle should control the facts of a novel situation, the unlawfulness of the official's conduct must, in light of pre-existing law, be apparent. Loftus v. Clark-Moore, 690 F.3d 1200, 1204-05 (11th Cir. 2012) (citing Terrell, 668 F.3d at 1255-56). The unlawfulness of the official's conduct, in this case, could not be deemed apparent in light of pre-existing law, because the only remotely similar binding precedent that Plaintiff cited addressing the same constitutional principles found that the official's conduct was lawful.

Nor is this a case in which the conduct involved so obviously violated the constitution that prior case law is unnecessary. This category of cases is "narrow" and encompasses

27

only "situations where 'the official's conduct lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" Id. at 1205 (quoting Terrell, 668 F.3d at 1255-57). The Eleventh Circuit has found that "[t]he Fourth Amendment's general proscription against 'unreasonable' seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances", and on the "rare" occasions where it has found that general Fourth Amendment principles made the constitutional violation obvious, the officer's conduct was "well beyond the hazy border that sometimes separates lawful from unlawful conduct, such that every objectively reasonable officer would have known that the conduct was unlawful." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1307 (11th Cir. 2006) (citing Evans v. Stephens, 407 F.3d 1272, 1283 (11th Cir. 2005)) (concluding that every reasonable officer would have known that handcuffing a compliant nine-year-old for purely punitive purposes was unreasonable). The unlawfulness of Defendant Allen's conduct was not readily apparent to him and would not be readily apparent to every objectively reasonable officer, so this narrow category does not apply in this case.

As the analysis has shown, Defendant Allen's conduct did not violate a clearly established right, and he is entitled to

AO 72A
(Rev. 8/82)

qualified immunity from Plaintiff's Fourth Amendment claims. To review, the undisputed evidence shows that: Defendant Allen knew that he had been summoned to assist Brantley County EMS, he was informed that Plaintiff had been combative to herself, he was told that Plaintiff had been scruffing and hitting herself in the head, and he perceived that Plaintiff's hair was all over her head in disarray. It is not clearly established that probable cause would be lacking for a reasonable and objective person, faced with this set of circumstances, to take Plaintiff to the hospital for evaluation.

### ii. Fourteenth Amendment

Plaintiff asserts an independent claim that she was falsely imprisoned in violation of the due process protections of the Fourteenth Amendment. "A § 1983 claim of false imprisonment requires a showing of common law false imprisonment and a due process violation under the Fourteenth Amendment." Campbell v. Johnson, 586 F.3d 835, 840 (11th Cir. 2009) (citation omitted). Common law false imprisonment requires (1) an intent to confine, (2) an act resulting in confinement, and (3) the victim's awareness of the confinement. Id. To show a due process violation, a plaintiff must prove that the defendant acted with deliberate indifference and deprived his "right to be free from continued detention after it was or should have been known that the detainee was entitled to release." Id.

AO 72A
(Rev. 8/82)

Defendants contend that Plaintiff's Fourteenth Amendment claim is redundant of her Fourth Amendment claim, because both claims arise out of an allegedly unlawful seizure. Dkt. No. 42, p. 7. In support, they cite Graham v. Connor, 490 U.S. 386 (1989), in which the Supreme Court held that

> *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims.

Id. at 395. By analogy, Defendants maintain that if a plaintiff's claim arises during a seizure, then it is governed by the Fourth Amendment, but if it arises while the plaintiff is jailed and awaiting trial, it is governed by the Fourteenth. Dkt. No. 42, p. 8. Defendants contend that the Fourteenth Amendment analysis is only appropriate for detainees in police custody and awaiting trial. Id. (citing, e.g., Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996); Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1211 (11th Cir. 1993)).

Plaintiff, however, cites two unreported Eleventh Circuit cases in which a Fourteenth Amendment false imprisonment analysis was done based on conduct that appears to have occurred

AO 72A
(Rev. 8/82)

at the site of the alleged seizure as opposed to in pretrial detention. Dkt. No. 41, p. 19 (citing Sevostiyanova v. Cobb Cnty., 484 F. App'x 355, 359 (11th Cir. 2012) (no Fourteenth Amendment violation found); Allen v. Gooden, 521 F. App'x 754, 756 (11th Cir. 2013) (no Fourteenth Amendment violation found)).

While Defendants' analogy to the excessive force context is compelling in that it would eliminate duplicative claims in the wrongful seizure context, the cases Defendant cites addressing Fourteenth Amendment due process violations do not clearly state that *only* pretrial detainees may bring Fourteenth Amendment claims or that the Graham decision applies outside of the excessive force context. Still, even if Defendant Allen's conduct constituted a violation of Plaintiff's due process rights because detention continued after it was, or should have been, known that Plaintiff was entitled to release, Plaintiff has not shown that Defendants were on notice and had fair warning that their conduct violated clearly established law. The only binding precedent Plaintiff cites to show that the law surrounding this claim was clearly established is Campbell, which established the general parameters for making out a false imprisonment claim under the due process clause of the Fourteenth Amendment. Dkt. No. 41, p. 28 (citing Campbell, 586 F.3d at 840). But Campbell is in no way materially similar to this case. That case involved a claim that the plaintiff's

AO 72A
(Rev. 8/82)

detention constituted false imprisonment where the sheriff allegedly instructed the jail not to accept the plaintiff's bail. Id. at 840. As in the Fourth Amendment context, in light of pre-existing law regarding Fourteenth Amendment false imprisonment claims, the unlawfulness of Defendant Allen's conduct was not apparent in the context of this case. See Anderson, 483 U.S. at 640. Qualified immunity bars Plaintiff's Fourteenth Amendment claims against Defendant Allen.

### d. Chief of Police Crews

If a supervisor did not personally participate in an alleged constitutional violation, he may be held liable under § 1983 when there is a causal connection between his actions and the alleged constitutional violation. Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted). "A causal connection can be established by . . . facts which support the inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id. (internal quotations omitted). In this case, there are no facts to support such inferences or such a causal connection, and Defendant Crews may not be held liable for the alleged conduct of Defendant Allen.

Qualified immunity also protects Defendant Crews. Just as Plaintiff has not shown that Defendant Allen's alleged conduct

AO 72A
(Rev. 8/82)

was clearly unlawful, she also has not shown that Defendant Crews' alleged conduct—failure to implement policies or train officers, such as Defendant Allen, regarding the legal standard for detaining individuals with mental health problems—was clearly unlawful, given the circumstances of this case. The rights at issue were not clearly established at the time of Defendant Crews' alleged misconduct.

### e. Municipal Liability

Plaintiff seeks to hold the City liable based on its failure to train Defendant Allen on the standards for detaining individuals under the Fourth and Fourteenth Amendments, based on the lack of police policies and procedures for dealing with the detention of people with mental health problems, and based on the City's alleged ratification of Defendant Allen's conduct.

"There is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers in making a false arrest." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978)). A city may only be held liable when its municipal "official policy" causes a constitutional violation. Id. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy,

AO 72A
(Rev. 8/82)

which policy can be attributed to a municipal policymaker."
City of Okla. City v. Tuttle, 471 U.S. 808, 823-24 (1985).

Inadequate police training "may serve as the basis for §
1983 liability only where the failure to train amounts to
deliberate indifference to the rights of persons with whom the
police come into contact." Gold, 151 F.3d at 1350 (quoting City
of Canton v. Harris, 489 U.S. 378, 388-89 (1989)). To show
deliberate indifference, "a plaintiff must present some evidence
that the municipality knew of a need to train and/or supervise
in a particular area and the municipality made a deliberate
choice not to take any action." Id.; see also Wright v.
Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) ("Before such
liability arises, however, the need for such training must be
plainly obvious to Department decisionmakers."). Plaintiff has
not presented any evidence that the City was on notice of a need
to train or supervise police officers regarding lawful seizures
in the mental health context. Defendant Crews testified that
this was only time anything similar ever happened, and Plaintiff
has presented nothing to undermine that evidence. The need for
the training Plaintiff claims was lacking was not plainly
obvious to police department or city decision-makers. Thus, the
City may not be held liable on a failure to train theory.

Plaintiff argues that Defendant Crews did not follow any of
the City's Police Department policies. Plaintiff also points

34

out that the City failed and refused to adopt new policies and procedures despite Crews' attempts to encourage the Mayor and City Council to adopt such policies. Plaintiff argues that, given the lack of policies and procedures on how police should handle individuals with mental health problems, Defendant Allen's allegedly wrongful seizure of Plaintiff was foreseeable, and the lack of procedures was a moving force behind Defendant Allen's unconstitutional misconduct. In support of its position, Plaintiff argues that "an official policy can be inferred from a municipality's omissions as well as from its acts." Dkt. No. 41, p. 22 (citing Wellington v. Daniels, 717 F.2d 932, 935-36 (4th Cir. 1983)). As Plaintiff also notes, "such omissions are actionable only if they constitute 'tacit authorization' of or 'deliberate indifference' to constitutional injuries." Id.

The problem with this argument, like the preceding argument, is that Plaintiff cannot point to any similar incidents, and "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality." Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (internal citations and quotations omitted). Where a plaintiff cannot show a series of constitutional violations from which deliberate indifference can be inferred, he "must show that the policy itself is unconstitutional." Id.

35

at 1311 (citing Estate v. Novack ex rel. Turbin v. Cnty. Of
Wood, 226 F.3d 525, 531 (7th Cir. 2000)).  There is no evidence
that the City was aware of a need to enact a policy regarding
police encounters with individuals with mental health issues.
The City's alleged "policy" of not implementing a new police
department policy or procedure regarding individuals with mental
health problems cannot be deemed an unconstitutional policy,
particularly where the City had no notice that this was an issue
that needed to be addressed, and no evidence was presented that
the policies presented by Defendant Crews that the City failed
to approve would have even addressed the issue.

Plaintiff also contends that the City should be liable
based on the fact that Defendant Crews, an authorized
policymaker for the municipality, "ratified" Defendant Allen's
conduct when he did not investigate the incident or reprimand
Defendant Allen.  Dkt. No. 41, pp. 23-24 ("Crews' failure to
investigate this incident, or reprimand or discipline Allen
constituted a policy, practice or custom of deliberate
indifference to Allen's misconduct.").  This argument fails
because Defendant Crews did not learn about Defendant Allen's
conduct until after all the relevant events took place.  Nothing
Defendant Crews could have done at that point could have undone
the alleged misconduct.  The alleged ratification could not have
caused the constitutional violation, and the City cannot be held

36

liable on this theory.[11]

Pembaur v. City of Cincinatti, 475 U.S. 469 (1986), does
not, as Plaintiff suggests, establish that every action by an
individual with final decision-making authority constitutes
official policy under § 1983. Dkt. No. 41, p. 21. It helps to
consider the facts of that case. In Pembaur, law enforcement
officers had orders to arrest and detain witnesses who were
summoned but failed to appear before the grand jury. Id. at
471-72. When the officers were refused admission to the
doctor's office in which the witnesses were located, they
consulted with the county prosecutor, who ordered them to
forcibly enter the doctor's clinic. The prosecutor, acting as
the final decision-maker for the county, directed the action
that resulted in the deprivation of the plaintiff's rights.
That is the type of single decision by a municipal policymaker
for which municipal liability may be imposed. Id. at 480.
Here, Defendant Crews did not even know about the encounter
between Defendant Allen and Plaintiff until after it was

---

[11] Plaintiff does cite to a Middle District of Florida case which found that a
genuine issue of material fact existed regarding whether a sheriff's failure
to investigate and discipline a deputy who used deadly force in essence
ratified the deputy's conduct. Salvato v. Blair, No. 5:12-cv-635, 2014 WL
1899011, at *14 (M.D. Fla. May 12, 2014). That finding was, at least in
part, based on the notion that the "subsequent acceptance of dangerous
recklessness by the policymaker tends to prove his preexisting disposition
and policy." Id. (citing Grandstaff v. City of Borger, Tex., 767 F.2d 161,
171 (5th Cir. 1985)). The same cannot be said in this case, where there is
no dispute that the issue of mental health seizures was not on Crews' or the
City's radar, and there was no preexisting disposition or policy regarding
this issue.

AO 72A
(Rev. 8/82)

completed. Nothing Defendant Crews did or said in his capacity as a final policymaker caused Defendant Allen to act as he did on August 3, 2011. _Monell_ liability is limited to acts which a municipality has officially sanctioned or ordered, and neither Defendant Crews, in his policymaker capacity, nor the City officially sanctioned or ordered Defendant Allen's conduct in the way that the prosecutor did in _Pembaur_. See _id._ 475 U.S. at 480. In this case, the City cannot be held liable based on any alleged conduct of or decision by Defendant Crews acting in his capacity as a final policymaker.

For all of those reasons, there is no basis for holding the City liable in this case.

### f. State Law Claims

Plaintiff brought state law claims against Defendants Allen and Crews for assault and battery, invasion of privacy, and false imprisonment. Both Defendants claimed entitlement to official immunity under Georgia law. In Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Plaintiff argued only that Defendant Allen was not entitled to summary judgment on Plaintiff's state law claims, suggesting that Plaintiff does not dispute Defendant Crews' entitlement to summary judgment on her state law claims against him.[12] See Dkt.

---

[12] Even if Plaintiff did dispute this, the Court would grant summary judgment on the state law claims against him.

AO 72A
(Rev. 8/82)

No. 41, pp. 26-32.

The Georgia Constitution enshrines the principal of official immunity; it states that officials shall not be subject to suit for the performance of discretionary functions unless "they act with actual malice or with actual intent to cause injury[.]" Gilbert v. Richardson, 452 S.E.2d 476, 482-83 (Ga. 1994) (citing Ga. Const. art. I, § 2, ¶ 9). "'[A]ctual malice' requires a deliberate intention to do wrong." Merrow v. Hawkins, 467 S.E.2d 336, 337 (Ga. 1996). Actual malice, or express malice, is distinguishable from the concept of "malice," which Georgia courts have defined as involving reckless disregard for the rights of others, and distinguishable from the concept of "implied malice," which has been defined as showing a "reckless disregard for human life." Id. at 338. The required intent must be to cause the harm suffered by the plaintiff and "not merely an intent to do the act purportedly resulting in the claimed injury." Selvy v. Morrison, 665 S.E.2d 401, 405 (Ga. Ct. App. 2008).

Plaintiff has not shown that Defendant Allen acted with the requisite intent for actual malice. Plaintiff contends that "[m]alice may be inferred from a total lack of probable cause[,]" and in this case, Defendant Allen's actions toward Plaintiff "constitute malice because there was a total lack of probable cause" for him to engage in the alleged wrongful

AO 72A
(Rev. 8/82)

conduct. As an initial matter, the Court has found that there was probable cause for Defendant Allen to seize Plaintiff. Additionally, the case that Plaintiff cites to establish that malice may be inferred from a total lack of probable cause, though considering a false arrest claim, was analyzing the standard for when malice may be inferred in malicious prosecution cases. See Jones v. Warner, 686 S.E.2d 835, 838 (Ga. Ct. App. 2009) (quoting Arbee v. Collins, 463 S.E.2d 922 (Ga. Ct. App. 1995) (citing O.C.G.A. § 51-7-44, falling under the "Malicious Prosecution" heading)). The court in that case does not explain why this inferred malice standard from the malicious prosecution statute should trump the actual malice standard (which is distinguishable from a lesser implied malice standard) for a court considering whether to grant official immunity. See Smith v. Lott, 730 S.E.2d 663, 669 (Ga. Ct. App. 2012) (finding that actual malice standard for official immunity applied where plaintiff advocated for the different actual malice standard from First Amendment jurisprudence). In any event, malice will not be inferred in this case, where the Court found Defendant Allen acted with probable cause.

There is no evidence that Defendant Allen intended to cause the harm that Plaintiff suffered. Plaintiff states that "Allen believed he had discretion to take May to the hospital because there was something wrong with her." Dkt. No. 41-3, ¶ 39.

There is no evidence that Defendant Allen had any knowledge of Plaintiff's past abuse by her father. There is no evidence showing anything other than Defendant Allen trying to help in a unique situation, although he may have been indelicate and wrong about Plaintiff's need for such help. Under the well-developed actual malice standard for official immunity, Plaintiff has not shown any evidence that Defendant Allen acted with actual malice sufficient to overcome official immunity.

Though Defendants' Motion for Summary Judgment suggested that Plaintiff's state law claims were asserted against all three Defendants (including the City), Dkt. No. 34-1, p. 24, the Court does not read the Complaint as asserting these claims against the City. The Complaint states, "[t]he Plaintiff also brings this action against Defendants Crews and Allen based upon state law claims for assault, battery, invasion of privacy, and false imprisonment." Dkt. No. 1, p. 2. Neither the rest of the Complaint nor Plaintiff's briefing suggests that Plaintiff is attempting to show that the City waived its sovereign immunity in regard to these claims. Plaintiff's response to Defendants' Motion for Summary Judgment confirms this understanding: Plaintiff's discussion of the state law claims starts with the heading, "Officer Allen Is Not Entitled To Summary Judgment On May's Claims for Assault and Battery, Invasion of Privacy and False Imprisonment." Dkt. No. 41, p. 28. Thus, like the

41

parties, the Court has not analyzed the City's sovereign immunity or potential liability for these claims.

**IV.  CONCLUSION**

The Court finds that Defendants Allen and Crews are entitled to qualified immunity against Plaintiff's federal claims and official immunity against Plaintiff's state law claims.  The City is also not liable for Defendant Allen's alleged conduct.  Based on these findings, Defendants' Motion for Summary Judgment is **GRANTED**.  The Clerk is ordered to enter the appropriate judgment.

**SO ORDERED**, this 31ST day of March, 2015.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)